Index No. CV 07 3222 (RPP)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KEVIN DAMION CRICHLOW,

Plaintiff,

- against -

THE CITY OF NEW YORK , *et al.*

Defendant.

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

**MICHAEL A. CARDOZO**
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Deborah Dorfman*
*Tel: (212) 788-0408*
*NYCLIS No. 2007-018295*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT………………………………………………………………1

STATEMENT OF FACTS ………………………………………………………………… 2

ARUGMENT……………………………………………………………………………2

POINT I: STANDARDS FOR DISMISSAL UNDER FED.
R. 12(b)(6) AND 12(b)(1)……………………………………………………………… 2

POINT II: …PLAINTIFF IS BARRED FROM RECEIVING COMPENSATORY DAMAGES
BY THE PRISON REFORM LITIGATION
ACT……………………………………………………………………………….........3

POINT III: PLAINTIFF  FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE
GRANTED.……………...……………………………………………………………4

    A.    Alleged Unconstitutional Conditions of Confinement………………………..4

        1.    Overcrowding……………………………………………………..6

        2.    Inadequate Bed Space & Lack of Privacy………………………..7

        3.    Incorrect Placement at OBCC………………………………….9

        4.    Personal Items…………………………………………………10

        5.    Time Spent In His Cell, Lock-In Time, & Food Trays………….11

        6.    Scheduling Activities: Exercise, Recreation, Indoor Gymnasium,
Law Library, and Sick Call………………………………….12

            a.    Exercise, Recreation & Access to the
Indoor Gymnasium……………………………………13

            b.    Law Library……………………………………………15

        7.    Staffing and Off-Housing Unit Activities………………………15

        8.    Inmate Assaults………………………………………………17

9.     Medical Care...................................................................17

10.    No Operating Lights in Cell for Three Days........................18

11.    Laundry Services.............................................................18

12.    Exposure to Communicable Diseases.................................19

13.    Sufficiency of Nutrition...................................................21

14.    Unsanitary Conditions.....................................................21

B.     Plaintiff Has Failed to Allege A Viable *Monell* Claim...............................22

POINT IV: CLAIMS AGAINST DEFENDANTS HORN, HOURIHANE, LANGSTON, AND
DAVIS SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS NOT ALLEGED THEIR
PERSONAL INVOLVEMENT IN THE INCIDENTS ALLEGED IN THE COMPLAINT
..................................................................................................... 23

POINT V: PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR LACK OF
STANDING  .......................................................................................23

CONCLUSION.........................................................................................24

**APPENDICES:**

Appendix I: Second Amended Complaint

Appendix II: The City of New York Board of Correction Minimum Standards for New York
City Correctional Facilities, §§ 1-05, 1-07, 1-08, 1-09

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

KEVIN DAMION CRICHLOW,

                                       Plaintiff,    **07 CV 3222 (RPP)**

           -against-

THE CITY OF NEW YORK, et al.,

                                    Defendants.

------------------------------------------------------------------------ x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

### PRELIMINARY STATEMENT

Plaintiff, a sentenced inmate, filed his Second Amended Complaint in December of 2007, alleging inadequate conditions of confinement while incarcerated at the Otis Bantum Correctional Center ("OBCC") and the Eric M. Taylor Center ("EMTC") on Riker's Island. These allegations included: overcrowding which allegedly led to inadequate access to personal supplies, laundry services, and exercise, among other complaints. Defendants now respectfully move this Court to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 12 (b)(1) on the grounds that: 1) plaintiff is barred from obtaining compensatory damages by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(e) for the claims for which he has failed to allege an actual physical injury; 2) plaintiff has failed to state a claim upon which relief can be granted as he has failed to allege facts sufficient to state constitutional violations as to his conditions of confinement; 3) because plaintiff has failed to allege claims sufficient to rise to the level of a constitutional violation, he cannot prove a *Monell* claim against defendant NYC; 4) plaintiff has failed to allege sufficient facts that the named defendants had personal involvement in the incidents and occurrences alleged in the Amended Complaint to establish liability for damages under §1983; and 5) this Court lacks subject matter jurisdiction over claims for which plaintiff lacks standing.

## STATEMENT OF FACTS

Plaintiff alleges numerous problems with conditions while he was incarcerated at OBBC and EMTC on Riker's Island as a convicted prisoner. *See generally* Amended Complaint, attached hereto as Appendix I. Specifically, plaintiff alleges that the OBCC and the EMTC at Riker's Island is overcrowded and as a result there was: inadequate sleeping space and lack of privacy; plaintiff was incorrectly housed at the OBCC; insufficient personal items; insufficient laundry services; excessive lock-in times, denial of opportunity for exercise, recreation, and to go to the law library; understaffing & inability to attend activities off of plaintiff's housing unit; he was assaulted twice by other inmates; he did not get adequate medical care; he exposure to communicable diseases; and unsanitary living conditions. *See id*. Plaintiff seeks compensatory damages and an award of attorneys' fees and costs. Amended Complaint, at p. 15.

## ARGUMENT

### POINT I

### STANDARDS FOR DISMISSAL UNDER FED. R. CIV. P. 12(B)(6) AND 12(B)(1)

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the allegations in the complaint are accepted as true. *Grandon v. Merrill Lynch*, 147 F.3d 184, 188 (2d Cir. 1998); *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

The standards for determining a motion to dismiss under to Fed. R. Civ. P. 12(b)(1) are "substantively identical" to those under 12(b)(6), except that for the purposes of a 12(b)(1) motion, it is the party "invoking the jurisdiction off the court" that has the burden of proof. *Lerner v. Fleet Bank, N.A.*, 318 F. 3d 113, 128 (2nd Cir.), *cert. denied* 540 U.S. 1012, 124 S. Ct. 532, 157 L. Ed. 2d

424 (2003). Additionally, unlike a 12(b)(6) motion[1], the court can consider additional papers and affidavits submitted by the moving party in support of the motion. *De Yu Zhang v. U.S. Citizenship and Immigration Service*, 2005 U.S. Dist. LEXIS 26805, *13 (S.D.N.Y. 2005). For the reasons stated below, the 2nd Amended Complaint should be dismissed.

## POINT II

### PLAINTIFF IS BARRED FROM RECEIVING COMPENSATORY DAMAGES BY THE PRISON REFORM LITIGATION ACT

The claims for which plaintiff has not alleged a physical injury should be dismissed pursuant to the Prison Reform Litigation Act ("PLRA"), 42 U.S.C. § 1997e(e). Section 1997e(e) of the PLRA, in relevant part, states that "No Federal civil action may be brought by a prisoner confined in jail, prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Courts in this District and in the Second Circuit have repeatedly held that where a prisoner, as defined under the PLRA, has failed to allege any physical injury, his compensatory damages claims must be dismissed. *See Jenkins v. Haubert*, 179 F. 3d 19, 28-29 (2d Cir. 1999); *Voorhees v. Goord*, 2006 U.S. Dist. LEXIS 48370 (S.D.N.Y. Feb. 24, 2006)(compensatory damages claims dismissed where inmate alleging custodial assault and threats by a correction officer failed to allege actual physical injury); *Brewster v. Nassau County*, 349 F. Supp. 2d 540, 553 (E.D.N.Y. 2004). This restriction on the recovery of compensatory damages under the PLRA is equally applicable to former prisoners. *Lipton v. County of Orange, New York, et al.*, 315 F. Supp. 2d 434 (S.D.N.Y. 2004) *citing Cox v. Malone*, 199 F. Supp. 2d 135, 140 (S.D.N.Y. 2002), *aff'd* 56 Fed. Appx. 43 (2d Cir. 2003)("The fortuity of release on parole does not affect the kind of damages that must be alleged in order to survive the gate-

---

[1] Except that in a 12(b)(6) motion a court may consider documents for which it can take judicial notice. *Chambers v. Time Warner*, 282 F. 3d 147, 153 (2nd Cir. 2002).

keeping function of section 1997e(e). Because plaintiff's suit alleges only emotional injuries, it is barred by the PLRA irrespective of his status as a parolee at the time of filling").

Here, the only physical injuries that plaintiff alleges relate to his claims that he was assaulted by other inmates (2nd Amended Complaint, ¶¶ 24-25) and his alleged inadequate medical care related to one of the assaults (*Id.*, ¶ 27). *See generally, id.* The only other harm that plaintiff alleges that he sustained was "genuine deprivation and hardship" (*Id.* at ¶ 39) and have caused him to be placed "at risk" of "increased violence, illness, mental suffering, and deteriorating health." *Id.*, ¶¶ 51,57. Such allegations are insufficient to meet the requirements of the PLRA's actual physical injury requirement. Thus, plaintiff's compensatory damages claims for which he has not alleged a physical injury are barred by the PLRA.

## POINT III

### PLAINTIFF FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

In spite of notice pleading requirements under Fed. R. Civ. P. 8, "a civil rights complaint 'must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under §1983." *Williams v. City of NY,* 2005 U.S. Dist. LEXIS 26143, at *8-9 *quoting Vishevnik v. Supreme Court,* 1999 U.S. Dist. LEXIS 15516 (S.D.N.Y. Oct. 6, 1999). Here, as discussed below, plaintiff has failed to establish a claim under § 1983.

### A. Alleged Constitutional Violations for Conditions of Confinement

The constitutional claims regarding a convicted prisoner's conditions of confinement are analyzed under the Eight Amendment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993). "The Eighth Amendment prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert denied*, 513 U.S. 1154 (1995). The Supreme Court has determined this to include punishments that "involve the unnecessary and

wanton infliction of pain." *Id. citing Gregg v. Georgia,* 428 U.S. 153, 173 (1976). While the Constitution prohibits inhumane conditions for prisoners, it 'does not mandate comfortable prisons.' *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) *quoting Rhodes v. Chapman,* 452 U.S. 337, 349 (1981).

In order for a prisoner to establish constitutional violations relating to conditions of confinement, he must meet a two prong test. First, the plaintiff must show that the deprivation is "sufficiently serious" or there exists a "substantial risk of serious harm" to the prisoner. *Farmer,* 511 U.S. at 834. A prisoner's uncomfortable living conditions are insufficient to establish a constitutional violation. *Jones* v. *Goord,* 435 F. Supp. 2d 221, 234-35 (S.D.N.Y. 2006) *quoting Wilson v. Seiter, et al.,* 501 U.S. 294, 298 (1991). Rather, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of "the minimal civilized measure of life's necessities". *Rhodes,* 452 U.S. at 347.

The second prong of the deliberate indifference test requires the plaintiff to show that the defendant has acted with a "sufficiently culpable state of mind." *Farmer,* 511 U.S. at 834 *citing Wilson,* 501 U.S. at 297. What constitutes a "culpable state of mind" under this prong of the constitutional analysis is dependent upon what harm is alleged. *Jones,* 435 F. Supp. 2d at 235. In matters involving conditions of confinement, the "deliberate indifference" standard is applicable. *Id. citing Wilson,* 501 U.S. at 303; *see also Hathaway v. Coughlin,* 99 F. 3d 550, 553 (2d Cir. 1996) (inmate must show that prison officials acted with "a sufficiently culpable state of mind"). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety, the official must be both aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Chance v. Armstrong,* 143 F. 3d 698, 701 (2d Cir. 1998) *quoting Farmer,* 511 U.S. at

837). In matters involving conditions of confinement, the deliberate indifference standard is applicable. *Chance*, 143 F. 3d at 701 *citing Wilson*, 501 U.S. at 303.

In order to properly allege that a defendant in §1983 action violated an inmate's constitutional rights, the plaintiff must allege that the defendant was specifically aware of the inmate's particular conditions of confinement and that such specific conditions posed "an excessive risk" to the inmate's health and safety and that the defendant disregarded that excessive risk. *Flynn v. Wright, et al.*, 2007 U.S. Dist. LEXIS 69422, at *6 (March 23, 2007) *citing Williams v. Fisher*, 2003 U.S. Dist. LEXIS 16442, 2003 WL 22170610, at *9 (S.D.N.Y. Sept. 18, 2003) (failure to allege knowledge of a specific condition placing the plaintiff at excessive risk to his or her health and safety insufficient to state a claim for deliberate indifference). Reliance on an official's alleged knowledge of general prison conditions does not satisfy the deliberate indifference pleading requirement as a plaintiff must allege facts that the defendant was aware of a specific risk or condition that would constitute an excessive risk to the inmate's health and safety and disregard that risk. *Melo v. Combes*, 1998 U.S. Dist. LEXIS 1793, 1998 WL 67667, at * 14 (S.D.N.Y. 1998).

1.    **Overcrowding**

The overall theme of the Complaint is that as a result of overcrowding, plaintiff was subjected to substandard living conditions and denied various services and opportunities to which he asserts he was entitled. *See generally,* Amended Complaint. Overcrowding and inadequate conditions of confinement resulting from overcrowding, as alleged by plaintiff, are "properly the subject of an Eighth Amendment claim only if the plaintiff can show that overcrowding caused the infliction of cruel and unusual punishment against him personally." *Coronado v. Goord, et al.*, 2000 U.S. Dist. LEXIS 13876, * 18 (Sept. 26, 2000) *citing Rhodes*, 452 U.S. at 348. "It is a rare case when a plaintiff can make out a claim that his injuries were caused by overcrowding." *Id.* at * 19-20 (citations omitted). Just because a jail is overcrowded and an inmate

suffers an injury or is placed at risk of injury does not mean that the risk is a result of overcrowding. *Rhodes*, 452 U.S. at 348, 18 U.S.C. § 3632(a)(1) ("A Federal court shall not hold prison or jail crowding unconstitutional under the eighth amendment except to the extent that an individual plaintiff proves that crowding caused the infliction of cruel and unusual punishment of that inmate.").

Here, set forth more fully below in Sections 2 through 14, plaintiff makes numerous conclusory allegations that the overcrowding led to unconstitutional conditions of confinement by pointing to a laundry list of unpleasant conditions to which the plaintiff was allegedly subjected. These conditions, however unpleasant, even when viewed in the "totality of the circumstances," do not violate the Constitution. Furthermore, plaintiff has failed to allege facts sufficient to show that the individually named defendants acted with deliberate indifference towards his health and safety.

## 2.  Inadequate Bed Space and Lack of Privacy

Plaintiff alleges that as a result of overcrowding at the OBCC and the EMTC, he was denied sufficient bed space and forced to sleep and bathe without privacy. 2nd Amended Complaint, ¶¶ 18, 19, & 33. There is no constitutional right to a particular amount of bed space. *See Benjamin, et al. v. Fraser. et al. (Benjamin II)*, 343 F. 3d 35, 53 (2d Cir. 2003). In *Benjamin II*, the Second Circuit explicitly rejected the District Court's finding that at inmates at Riker's Island must be afforded at least 6 feet of sleeping space at each inmate's head to meet constitutional requirements. *Id.* at 53 . The Court, in relevant part, held that "there is no constitutional requirement that pretrial detainees[2] have six feet of breathing room". The Court also stated that in order to establish a constitutional violation resulting from inmates sleeping too closely to one and other, the inmates would have to

---

[2] Since pretrial detainees are to be given at least the same rights as convicted prisoners, convicted prisoners, such as plaintiff, does not have any additional rights in this regard, and in fact may have less than pretrial detainees.

demonstrate an actual or imminent risk of substantial harm". *Id. citing Lewis v. Casey*, 518 U.S. 343, 350 (1996).

Here, plaintiff alleges that while housed in "1 Upper" at the OBCC, he was forced to sleep in a bed placed approximately six inches away from the inmate next to him and that these conditions violated §1-05 of the City's Minimum Standards. 2nd Amended Complaint, ¶ 18. He further alleged that while housed in "1 Upper" at the OBCC, "fifty men slept and bathed without privacy." *Id.*, ¶ 19. Plaintiff also has alleged that at the EMTC his bed was 1 foot away from the person sleeping next to him and alleged that this violated the Minimum Standards. *Id.*, ¶ 33. Plaintiff, however, has not alleged that as a result of any of these conditions he suffered an actual substantial harm. Thus, he cannot meet the first prong of the deliberate indifference standard required in *Benjamin* to establish a constitutional violation for inadequate bed space. *See Benjamin*, 343 F. 3d at 53. Moreover, he was not subjected to these conditions for long periods as he was only at the OBCC for 14 days (*see* 2nd Amended Complaint, ¶ 8 and in the doors of 8 Main and 6 Upper at the EMTC for a total of approximately 2 and ½ months. *Id.*, ¶¶ 5, 29.

Plaintiff has also failed to meet the second prong of the test in that he cannot establish that defendants acted with a "sufficiently culpable state of mind." Plaintiff's generalized and conclusory allegations of deliberate indifference as to the general conditions lack the specificity of pleading required, even in light of notice pleading rules under Fed. Civ. P. 8, to establish a claim for the second prong of an Eighth Amendment claim. *See* Point III.A. at p. 6. Specifically, plaintiffs alleges no specific facts establishing that the individually named defendants were involved in or aware of the alleged conditions, that they were aware of an excessive risk to his health and safety and that they disregarded this risk. *See* 2nd *id.*, ¶¶51, 52, and 54, respectively. None of these allegations or any of the other allegations identify facts to establish that any of the individual

defendants were aware of plaintiff's specific conditions of care, that such conditions posed an "excessive risk" of harm to his health and safety, and that they disregarded this risk.

Finally, as discussed under Point II, plaintiff has also failed to allege that he suffered a physical injury as a result of inadequate bed space and lack of privacy. Consequently, he has failed to state a constitutional claim for which relief can be granted for his claims about inadequate bed space and denial of privacy and thus, this claim must be dismissed.

### Section 1-05 of the City of New York Board of Correction Minimum Standards for New York City Correctional Facilities

Plaintiff also alleges that lack of privacy in his sleeping area and the inadequate bed space violated the § 1-05 of the City of New York Board of Correction Minimum Standards for New York City Correctional Facilities ("Minimum Standards"), attached hereto as Appendix II.[3] Even construing plaintiff's allegations as true, these conditions violated § 1-05 of the Minimum Standards, these standards are not enforceable in federal court. *See Handberry v. Thompson*, 446 F. 3d 335, 344-46 (2d Cir. 2006)(The PLRA limits federal court relief to federal claims). Furthermore, a violation of these Standards is no *per se* a constitutional violation, as a plaintiffs must show that the violation of these standards meets the two prong deliberate indifference test.

### 3.    Incorrect Placement at OBCC

In his Second Amended Complaint, plaintiff claims that he was medically fragile and "wrongly" assigned to be housed at the OBCC which he alleges was for high risk inmates and gang members. 2nd Amended Complaint, ¶ 17. This allegation does not suffice to state a constitutional claim because his placement at OBCC, as he alleges, was only for two weeks and thus, was not a sufficiently serious deprivation. Additionally, plaintiff did not allege that he suffered any actual injury as a result of being placed at the OBCC. Further, plaintiff has not alleged any facts

---

[3] Defendants respectfully request that the Court take judicial notice of the DOC Minimum Standards given that plaintiff has specifically incorporated them by reference into his Complaint. *Chambers*, 282 F. 3d at 153.

suggesting that his placement at the OBCC was anything more than a mistake. Even if it were construed to be negligent by the Court, mere negligence is not enough to state a constitutional violation. *Farmer*, 511 U.S. at 824 *quoting Whitley v. Albers*, 475 U.S. 312 (1986)("Eighth Amendment liability requires more than lack of ordinary due care for the prisoner's interests or safety).

### 4    Personal Items

"Temporary deprivations of toiletries do not violate the Constitution. *See Trammell v. Keane*, 338 F. 3d 155, 165 (2d Cir. 2003)(deprivation of "toiletries for approximately two weeks—while perhaps uncomfortable—does not pose such an obvious risk to inmate's health and safety that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they drew] the inference.'" *quoting Farmer*, 511 U.S. at 837.

Here, plaintiff alleges that he was routinely denied person hygiene items such as toothpaste, detergent, toilet paper, and blankets at the OBCC. 2nd Amended Complaint, ¶ 19.  Although he alleges that these, among other conditions, led to "increased stress levels, physical discomfort, medical risk, and acts of aggression" (*Id.*), these allegations are not sufficiently serious nor of longer duration (plaintiff was only at the OBCC on "1 Upper" for  7 days. Id, ¶¶ 17, 20) to establish a constitutional deprivation. Moreover, plaintiff has failed to allege that he suffered any actual serious injury.

Plaintiff also alleges that while housed in "2 Upper" of the EMTC there were also shortages of personal supplies *Id.*, ¶ 23.  The fact that plaintiff had to go without some personal supplies on some occasions does not rise to the level of a constitutional violations as he has not established that he suffered an actual injury that was sufficiently serious as is required to allege a constitutional violation in prison or jail conditions context.  Finally, plaintiff has failed to allege facts sufficient to

show that defendants acted with a culpable state of mind in regards to his alleged deprivation of personal hygiene items. *See* Point III.A. at p.6.

### 5. Time Plaintiff Spent In His Cell, Lock-In Time, & Food Trays

Plaintiff complains that the period of time each day that inmates were required to be "locked in" to their cells so that the correctional officers could carry out various job duties such as searches and shift changes, were "longer than they should" and the amount of time that plaintiff spent confined to his cell was regularly extended because the one officer assigned to his housing unit assisted with searches of other areas of the facility. 2nd Amended Complaint , ¶ 21.

Pretrial detainees have due process interests in being free from restraints on their liberty such as being locked in cells excessively. *See Benjamin I*, 264 F. 3d at 188. To determine whether an inmate has suffered a constitutional deprivation resulting from such restraints, the appropriate analysis depends upon the purpose of the restriction imposed. *Taylor v. Santana*, 2007 U.S. Dist. LEXIS 18438, *14 (S.D.N.Y. March 6, 2007). If the restraint is administrative and not punitive, the inquiry is whether it is being imposed for a legitimate purpose. *Benjamin I* , 264 F. 3d at 188. Such purposes include "maintaining security and order, and any measure having the tendency to promote efficient management of the detention facility." *Zolnwolsky v. County of Erie*, 944 F. Supp. 1096, 1111 (W.D.N.Y. 1996) *citing Lareau*, 651 F. 2d at 104.

Here plaintiff was a convicted prisoner and was not entitled to any more rights than those of a detainee. *Bell v. Wolfish,* 441 U.S. 520 (1979). Plaintiff alleges that the "lock-ins" were for security and administrative purposes such inmate housing searches and shift changes. 2nd Amended Complaint, ¶ 20. These reasons have been recognized by the courts as activities that serve a legitimate purpose related to jail security and operational needs. Plaintiff has also not alleged facts demonstrating that defendant or any individual acted with deliberate indifference with regard to the excess lock-in time or that he suffered any injury resulting from being locked-in to his cell for

administrative purposes.   These allegations do not, therefore, rise to the level of constitutional violations upon which relief can be granted and should be dismissed.

Plaintiff also alleges that while at the OBCC, he was housed in his cell for approximately 11-12 hours per day because the common area outside of the cells did not accommodate all of the 50 inmates in housing unit. 2nd Amended Complaint, ¶ 21.  He also alleges that "some inmates were forced to eat with their meal trays in their laps since there were not enough tables for all of the inmates." *Id.*  Plaintiff, however, has not alleged any facts that his confinement to his cell for 11-12 hours per day was in any way punitive. *See id.* He also specifically alleges that inmates were allowed to leave their cells in the common area. *Id.*  Finally, plaintiff has again failed to allege an actual injury suffered as a result of having to stay in his cell 11-12 hours per day while at the OBCC for approximately four months.  Nor has he alleged he had to eat with his tray in his lap, much less that he suffered an injury as a result. Plaintiff has therefore, failed to allege facts sufficient to demonstrate that his confinement in his cell was a "sufficiently serious" deprivation to satisfy the objective prong of the deliberate indifference test.

Finally, plaintiff has not alleged facts sufficient to show that defendants acted with a culpable state of mind in regards to these allegations and therefore has not satisfied the second prong of the deliberate indifference test. *See* Point III.A. at p. 6.

### 6.    Scheduling of Activities: Exercise, Recreation, Indoor Gymnasium, Law Library, and Sick Call

Plaintiff alleges that while housed at the OBCC and EMTC, he was denied adequate exercise, recreation, and opportunities to go to the law library because he had to chose between exercise, recreation, and the law library because these activities were offered at the same time as commissary, meals, and sick calls in violation of §§ 1-07 and 1-09 of the Minimums Standards. 2nd Amended Complaint, ¶¶ 22, 28.  He also alleges that while at the GVRC for a 17-day period he was

denied the ability to go to the law library. *Id.*, ¶ 29. For the reasons discussed below, these claims do not amount to constitutional violations.

a.    **Exercise, Recreation & Access to the Indoor Gymnasium**

Inmates have a right to some opportunity for exercise *Anderson v. Coughlin*, III, 757 F. 2d 33, 35 (2nd Cir. 1985), but do not have a constitutional right to recreation. *Beckford v. Protuondo*, 151 F. Supp. 2d 204, 213 (N.D.N.Y. 2001) *citing French v. Owens*, 777 F. 2d 1250, 1255 (7th Cir. 1985) ("it is not the right to recreation, but, rather, the right to exercise that the Eight Amendment protects."). In examining whether an inmate's constitutional rights have been violated, a review of the inmate's "availability of exercise is a key ingredient of a court's analysis." *Williams v. Greifinger*, 97 F. 3d 699, 704 (2d Cir. 1996).

Here, plaintiff's allegations do not satisfy either prong of the deliberate indifference test to state a constitutional claim. *See Anderson*, 757 F. 2d at 35.   First, since there is no constitutional right to recreation, plaintiff's claim in regards to opportunities for recreation must be dismissed.

Plaintiff's allegations that he was only allowed to go to the gym twice while at the EMTC and that inmates were not provided warm, water resistant clothing or footwear to wear in the yard (2nd Amended Complaint, ¶ 32 ) are also insufficient to state a constitutional claim because plaintiff has failed to allege facts sufficient to demonstrate such conditions were sufficiently serious to cause him to suffer or be placed at risk of serious harm to his health and safety, particularly given the temporary nature of these alleged deprivations.   Plaintiff's incarceration at EMTC was only approximately 8 months from mid-February until October. *Id.*, ¶ 5. The winter months during this period were only a short portion of that time. At best, any deprivation of exercise due to the inability to go outside was temporary during periodic inclement weather and plaintiff has not alleged that he was denied the opportunity to go outside or that the weather was inclement for the entire period of his incarceration at the EMTC.   Temporary deprivations of the ability of an inmate

to go outside during inclement weather are not violate the constitution. *Anderson*, 757 F. 2d at 36; *Gibson v. City of New York*, 1998 U.S. Dist. LEXIS 3618, *10 (S.D.N.Y. 1998)(brief periods of deprivation of exercise due to bad weather not a constitutional violation). Plaintiff has also alleged no physical injury as a result of this alleged deprivation. He is also not at risk of such harm since he is no longer at the EMTC.

Plaintiff's claim that he was unable to have opportunities for exercise because such opportunities conflicted with other activities is also not sufficient to state a constitutional claim. Plaintiff has not alleged facts sufficient to state a claim that this deprivation was sufficiently serious and that as a result, plaintiff was deprived "the minimal civilized measure of life's necessities or that suffered harm or a risk of harm to his health and safety.

Plaintiff also has not alleged facts sufficient to demonstrate that defendants acted with a culpable state of mind in regards to this alleged denial. *See* Point III.A at p. 6. He has not alleged any facts indicating that defendants were aware of plaintiff's access to exercise, that consequently there was a excessive risk of harm to plaintiff's health and safety, and that they disregarded that specific serious harm or risk of harm.

Finally, nothing in the Minimum Standards prohibits that more than one activity from being scheduled at the same time. *See* Minimum Standards, attached hereto as Appendix II. Even if the Minimum Standards, however, did have such a prohibition, as noted above. Compliance with the Minimum Standards is not enforceable in federal court. *See* §2 at p. 9.

Plaintiff's claim that he was unable to have opportunities for exercise because such opportunities conflicted with other activities is also not sufficient to state a constitutional claim. Plaintiff has not alleged facts sufficient to state a claim that this deprivation was sufficiently serious and that as a result, plaintiff was deprived "the minimal civilized measure of life's necessities or that suffered harm or a risk of harm to his health and safety. Additionally, and as plaintiff has

-14-

acknowledged, he was allowed to exercise at some times during his 8 month incarceration at the EMTC. *See 2nd* Amended Complaint, ¶ 32.

Plaintiff also has not alleged facts sufficient to demonstrate that defendants acted with a culpable state of mind in regards to this alleged denial. *See* Point III.A.2 at p. 6. He has not alleged any facts indicating that defendants were aware of plaintiff's access to exercise, that consequently there was a excessive risk of harm to plaintiff's health and safety, and that they disregarded that specific serious harm or risk of harm.

### b.    Law Library

Inmates have a constitutional right to reasonable and meaningful access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 821, 824-25 (1977). To properly allege an access to courts claim, a plaintiff must show: 1) deliberate indifference by jail personnel to this right; and 2) an actionable claim causing injury. *Stanislaus v. Tolson*, 2002 U.S. Dist. LEXIS 10733, * 4-5 (E.D.N.Y. March 19, 2002). An inmate must specifically allege that he was prevented from pursuing a legal action resulting from inadequate access to the courts. *Lewis,* 518 U.S. at 354-55. "[A] delay in being able to work on one's own legal action or communicate with the court does not rise to the level of a constitutional violation." *Herrera v. Scully*, 815 F. Supp. 713, 725 (S.D.N.Y. 1993).

Here, plaintiff has not adequately alleged a constitutional claim for denial of access to the law library as he has not alleged that he suffered an actual injury as a result of allegedly being denied access to the law library, including facts that he was denied the ability to pursue a claim as a result of this deprivation as required by *Lewis*. Plaintiff has also failed to allege sufficient facts that to meet the pleading requirements of both the objective "sufficiently serious" prong and the subjective culpability prong of the deliberate indifferent standard. *See* Point III.A at p. 6. Consequently, his law library claims must be dismissed.

### 7.    Staffing and Off-Housing Unit Activities

Plaintiff alleges that as a result of overcrowding and understaffing there was not enough staff to escort inmates to off-housing unit activities and consequently plaintiff was deprived of the opportunity to attend activities such as the law library and religious services. 2nd Amended Complaint, ¶ 31. As discussed below, plaintiff has failed to state a constitutional claim upon which relief can be granted and these claims must be dismissed.

Plaintiff's law library claims should be dismissed for the reasons discussed in § 6 immediately above. Plaintiff also claims that due to overcrowding and understaffing he could not attend the religious[4] services "on numerous occasions". *Id.*, ¶ 31. These claims, however, do not rise to the level of constitutional violations. Although inmates have a right to have access to religious services (*Young v. Coughlin*, 866 F. 2d 567, 570 (2d Cir. 1989)), these rights are not absolute and must be balanced with the legitimate security needs of the institution. *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987). Jail officials have a compelling government interest, due to legitimate security interests, in restricting inmates' attendance at religious services when there are not enough officers to provide the necessary escort and related services needed for inmates to attend such activities. *Muhammed , et al. v. City of New York Dept of Corrections, et al.*, 904 F. Supp. 161 (S.D.N.Y. 1995), *appeal dismissed* 126 F. 3d 119 (2d Cir. 1997).

Here, like in *Muhammed*, defendants have a compelling state interest in maintaining the security of the EMTC. Restrictions imposed on inmates in attending a religious services when there were insufficient numbers of officers to escort them to services, as discussed in *Muhammed*, are in furtherance of a compelling state interest reasonably related to a legitimate institutional security interest. Furthermore, plaintiff has failed to allege facts sufficient to establish a culpable state of

---

[4] Plaintiff has not raised a claim under the First Amendment of the United States Constitution or under the Religious Land Use and Institutionalized Person Act, 42 U.S.C. §2000cc, in regards to his claim that he was denied the ability to attend Muslim services. Therefore, this claim will only be analyzed under the Eighth Amendment.

mind on the part of the defendants in regards to this claim to satisfy the second prong of the deliberate indifference standard. *See* Point III.A. at p 6.

### 8.    Inmate Assaults

Inmates deprived adequate protection from harm by other inmates may have a constitutional claim if they can demonstrate deliberate indifference on the part of the correctional facility defendants. *See Farmer*, 511 U.S. at 834; *see also Coronado*, 2000 U.S. Dist. LEXIS at * 8. The harm that a prisoner must allege be objectively "sufficiently serious" and that prison officials acted with deliberate indifference to the safety of the inmate.

In this case, plaintiff alleges that he was assaulted by other inmates on two different occasions and makes conclusory allegations that these assaults resulted from overcrowded conditions. *See* 2nd Amended Complaint, ¶¶ 24, 25, & 26. Plaintiff, does not allege facts sufficient to demonstrate that these assaults were any thing but isolated incidents or that defendants failed to protect him from harm. Further, he does not allege that defendant acted with a culpable state of mind. To the contrary---plaintiff specifically alleges that correction officers took steps to protect him from further assault by placing him in voluntary protective custody following the second attack. Id.,¶ 26. Plaintiff's claims do not establish constitutional violations.

### 9.    Medical Care

To state a constitutional claim for inadequate medical care under the Eighth Amendment, a plaintiff must allege facts that the deprivation of medical care was sufficiently serious. *Estelle v. Gamble*, 429 U.S 97, 106 (1976). To determine if the alleged deprivation of medical care is sufficiently serious, the court must consider whether the medical care allegedly deprived of represents "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway*, 37 F. 3d at 66 *citing Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990(Pratt, J. Dissenting). The second, subjective prong of the deliberate indifference test in medical care cases

requires that the deprivation be "brought about by the defendants in wanton disregard of those rights," in other words that a defendant act with a sufficiently culpable state of mind. *See Wilson*, 501 U.S. a 298-299.

Here, plaintiff alleges tha he received inadequate medical care for his face injuries from an inmate assault. 2nd Amended Complaint, ¶ 27. He alleges that he was denied pain medication, sick call, and care for his wounds.  These alleged denials are not sufficiently serious as plaintiff has not alleged facts that they are life-threatening or fast degenerating. *See Liscio v. Warren*, 901 F. 2d 274, 277 (2d Cir. 1990); *see also Chatin v. Artuz,* 1999 U.S. Dist. LEXIS 11918, at *11 (S.D.N.Y. Aug. 4, 1999)(subjective complaints of pain *not* sufficient: "[plaintiff's] alleged problems in is right foot may indeed be very real. His pain is not, however, of the type contemplated for satisfaction of the objective standard."). Even if plaintiff could demonstrate that the medical condition was sufficiently serious, he still could not state a constitutional claim because he has not alleged any facts that that the defendants acted with a sufficiently culpable state of mind regarding his medical care.

### 10.    No Operating Lights in Cell for Three Days

Plaintiff alleges that he did not have operating lights in his cell while at the GVRC for a three days.  Such temporary conditions are not sufficiently serious so as to violate the constitution. *Wilson*, 501 U.S. at 294.  Plaintiff also has not alleged facts that defendants acted with a culpable state of mind nor has he alleged an actual injury. *See* Point III.A at p. 6.

### 11.    Laundry Services

Courts in this jurisdiction have held that there is no constitutional violation where "inmates are provided the opportunity and the supplies to wash their clothes." *Lunney v. Brureton*, 2007 U.S. Dist. LEXIS 38660* (S.D.N.Y. May 25, 2007).  In addition, courts have held that inmates forced to live in an unsanitary environment on a temporary basis is "insufficiently serious"

such as to constitute a constitutional violation. *See Giglieri*, 1997 U.S. Dist. LEXIS 10771, *9-10 *citing Wilson*, 501 U.S. at 294.

Here, plaintiff does not allege that he was unable to wash his clothes. Instead, he alleges that laundry services were "insufficient to provide each inmate in EMTC with a clean change of clothing at least twice per week in accordance with § 1-04 of the Minimum Standards." 2nd Amended Complaint, ¶ 34. As discussed above, a violation of the Minimum Standards does not necessarily constitute a constitutional violation and is not enforceable in federal court. A plaintiff must meet the two-prong test of the deliberate indifference standards described above to make a claim for a constitutional violation in regards to his allegations about the laundry service. Plaintiff has not alleged sufficient facts to meet these requirements.

Plaintiff also does not allege any actual or serious risk to his health and safety resulting from insufficient laundry service at the EMTC or at the GVRC. *See generally*, id. Finally, plaintiff has not adequately alleged facts that defendants acted with a culpable state of mind in regard to this claim. *See* Point III.A at p. 6.

## 12.    Exposure to Communicable Diseases

Plaintiff alleges that as a result of overcrowding at Riker's Island, defendants are "unable to provide adequate medical isolation of ill and infectious prisoners…" and that "inmates who have be designated as 'Medically Isolated' are mixed with the general population." 2nd Amended Complaint, ¶ 35. Plaintiff also alleges that while at the EMTC he was housed with an inmate who had tested positive for Tuberculosis ("TB"). *Id.*

To state a claim for constitutional violations resulting from exposure to communicable diseases, while an inmate need not allege an actual injury, he must allege a "substantial risk of serious harm" such that the exposure "posed an unreasonable risk of serious damage to his future health." *Helling*, 509 U.S. at 33. It must also be alleged that the disease or exposure is so serious

"that to ignore the condition would violate contemporary standards of decency." *Id.*; *see also Wise, et al. v. Chassin, et al.*, 1997 U.S. Dist. LEXIS 20496, *7-8 (S.D.N.Y. Dec. 2, 1997)(exposure to latent TB).

Plaintiff's allegations here are insufficient to establish a constitutional violation. First, except for the TB to which plaintiff alleges he was exposed, plaintiff has failed to allege that he was exposed to any other diseases as a result of the is alleged condition of confinement or whether the diseases were so serious that the failure to prevent such exposure "would violate contemporary standards of decency", or that the exposure posed an unreasonable risk of serious damage to his future health.

In regards to his allegation that he was exposed to an inmate who had "tested positive" for TB, this claim to is insufficient to state a constitutional violation. The fact that an inmate tests positive for TB and is housed with others, alone, is not enough to meet the "sufficiently serious" prong of the deliberate indifference test. *Bolton v. Goord*, 992 F. Supp. 604, 628 (S.D.NY. 1998)(failure to exclude inmates who have tested positive for TB from double bunking does not present a sufficiently serious injury). In order to adequately plead a claim about such exposure, plaintiff must have alleged a "substantial risk of serious harm" such that the exposure to the inmate who tested positive for TB "posed an unreasonable risk of serious damage to his future health." *Helling*, 590 U.S. at 33.

Plaintiff has not alleged facts sufficient to demonstrate that defendants acted with a culpable state of mind. Plaintiff has not alleged that defendants were aware that the inmate with TB was housed in the same living area as plaintiff, that plaintiff suffered serious harm or an excessive risk of harm due to this alleged exposure, and that defendants disregarded this harm or risk of harm. Plaintiff's generalized allegations are insufficient to meet pleading requirements to allege deliberate indifference. *See* Point III.A. at p. 6.

13.    **Sufficiency of Nutrition**

Plaintiff alleges that due to overcrowding at the EMTC there was inadequate amounts of food for special diets and thus his dietary needs were often not met as he did not always get the proper nutrition that he requires-specifically a dietary supplement called "Ensure". 2nd Amended Complaint, ¶ 36. These allegations, however, do not rise to the level of a constitutional violation. The constitution requires that jails provide "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of inmates who consume it." *Alston v. Coughlin*, 668 F. Supp. 822, 834 (S.D.N.Y. 1987) *citing Ramos v. Lamm*, 639 F. 2d 559 (10th Cir. 1980).

Here, plaintiff, although he has alleged that he needs Ensure for his health, does not allege any facts that he was placed in an immediate risk of danger to his health or well being because he sometimes did not receive his Ensure. He also has not alleged facts sufficient to show that defendants acted with a culpable state of mind. *See* Point III.A. at p. 6. Plaintiff's claims in regards to his nutrition and this claim should be dismissed.

14.    **Unsanitary Conditions**

Plaintiff alleges that while at the EMTC, his dining and dormitory areas were "infested with insects, mice, and other vermin and that food was often served on unclean trays." 2nd Amended Complaint, ¶ 37. "The mere presence of vermin in a prisoner's housing area does not constitute 'punishment' under the Eighth Amendment." *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003)(plaintiff failed to state a claim where he alleged his cell was infested with roaches and was cold) *citing Benjamin v. Fraser*, 161 F. Supp. 2d 151, 174 (S.D.N.Y 2001).

Here, plaintiff's allegations of insects, mice and other vermin in his living area and food served on unclean trays does rise to the level of a constitutional violation. Plaintiff has not alleged a deprivation that was sufficiently serious to meet the objective prong of the deliberate indifference

test (see *McCoy*, 255 F. Supp. 2d at 260)) and plaintiff has failed to allege any that he suffered an actual physical injury resulting from these alleged unsanitary conditions.    He also not alleged sufficient facts that defendants acted with a culpable state of mind. *See* Point III.A. at p. 6. This claim and should be dismissed.

### B.    Plaintiff Has Failed to Allege A Viable *Monell* Claim

To state a § 1983 claim against a municipality, a plaintiff must allege that an unconstitutional act occurred pursuant to an official policy or custom. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690-91 (1978).  Local governments can only be sued directly under § 1983 for monetary, declaratory, or injunctive relief "where the action that is alleged to have violated federal law 'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Comm. Health Care Ass'n v. DeParle*, 69 F. Supp. 2d 463, 474 (S.D.N.Y. 1999) *quoting Monell*, 436 U.S. at 690. There must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation" and that the municipality can be faulted for the deprivation. *Caminero v. Rand*, 882 F. Supp. 1319, 1323 (S.D.N.Y. 1995) *quoting City of Canton  v. Harris*, 489 U.S. 378, 385 (1989).  If a plaintiff cannot prove any set of facts to show an underlying constitutional violation, he cannot prove a claim of liability against a municipality under § 1983. *See Zahra v. Town of Southerland*, 48 F. 3d 674, 685 (2nd Cir. 1995)(to succeed on a §1983 claim against a municipality, plaintiff must prove denial of a constitutional right).

Here, because plaintiff has not pled sufficient facts demonstrating a constitutional violation and thus has failed to allege facts to sufficient to show municipal liability.  *See Monell*, 436 U.S. at 694.  The claims against New York City should be dismissed.

**POINT IV**

**CLAIMS AGAINST DEFENDANTS HORN, HOURIHANE, LANGSTON, AND DAVIS SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS FAILED TO ALLEGE THEIR PERSONAL INVOLVEMENT IN THE INCIDENTS ALLEGED IN THE COMPLAINT**

In order to bring a § 1983 claim against an individual for civil rights violations for damages, a plaintiff must specifically allege personal involvement of the individual against whom such claims are being brought. *See Colon v. Coughlin*, 58 F. 3d 865, 873 (2nd Cir. 1995). The failure to specifically plead such allegations is fatal to the complaint. *See Finger*, 2004 U.S. Dist. LEXIS 11048, at * 18. Supervisory liability can only be shown in the following ways:

> actual direct participation in the constitutional violation, (2) the failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned the conduct amounting to a constitutional violation or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Richardson v. Goord*, 347 F. 3d 431, 435 (2nd Cir. 2003). A theory of *respondeat superior* cannot form the basis of such liability. *Finger*, at *18.

Here, plaintiff did not allege that Horn, Hourihane, Langston, or Davis were personally involved in the alleged incidents, that they were grossly negligent in supervising their subordinates, or that they failed to act on information that unconstitutional acts were occurring. *See generally* 2nd Amended Complaint. Plaintiff has only made general, conclusory allegations that defendants' "policies, procedures, acts, and omissions" placed him at unreasonable risk. *Id.*

**POINT V**

**PLAINTIFF'S CLAIMS SHOULD BE DISMISSED FOR LACK OF STANDING**

With repect to this point, defendants incorporate by reference their arguments set forth in Point V in their Memoranda of Law in Support of their Motions to Dismiss in related cases, *Bush v.*

*NYC, et al.*, 07 Civ. 4019 and *Brewster v. NYC, et al.*, 07 Civ. 4016, filed herewith. Plaintiff Crichlow, like plaintiffs Bush and Brewster, has raised numerous claims for which he lacks standing to bring because he has failed to allege any injury in fact. *U. S. v. Hayes*, 515 U.S. 737, 742 (1995)(citations omitted), *see also Lewis*, 518 U.S. at 349.

## CONCLUSION

**WHEREFORE**, defendants respectfully request that their motion to dismiss the Complaint be granted and that plaintiff's request for relief be denied in all respects.

Dated: New York, New York
January 18, 2008

> **MICHAEL A. CARDOZO**
> Corporation Counsel of the
>   City of New York
> Attorney for Defendant
> 100 Church Street, Room 2-185
> New York, New York 10007
> (212) 788-0408
> By: _____
>       Deborah A. Dorfman
>       Assistant Corporation Counsel

TO: Stroock, Stroock & Lavan, LLP, Counsel for Plaintiff

APPENDIX I

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KEVIN DAMION CRICHLOW

                 Plaintiff,

     vs.

THE CITY OF NEW YORK, MARTIN F. HORN,
in his individual and official capacity as
Commissioner of the New York City Department of
Corrections, MICHAEL HOURIHANE in his
individual and official capacity as Warden of the Otis
Bantum Correctional Center, ROBERT SHAW, in
his individual and official capacity as Warden of the
George R. Vierno Center, SANDRA LANGSTON,
in her individual and official capacity as Warden of
the Eric M. Taylor Center, JOANDREA DAVIS, in
her individual and official capacity as Warden of the
Eric M. Taylor Center,

                 Defendants.

**SECOND AMENDED**
**COMPLAINT**

Civil Action No. 07 Civ 3222 (RPP)

Plaintiff KEVIN DAMION CRICHLOW, by and through his attorneys Stroock &

Stroock & Lavan LLP, alleges upon knowledge as to himself and upon information and belief as

to all other matters as follows:

## PRELIMINARY STATEMENT

     1.    Mr. Crichlow files this action pursuant to 42 U.S.C. § 1983 seeking

redress of injuries he suffered while in the custody of the New York City Department of

Correction (the "DOC") for deprivation under color of state law of the rights, privileges and

immunities secured to him by the United States Constitution and in particular the Eighth and

Fourteenth Amendments thereof.

2.      Specifically, Mr. Crichlow challenges and seeks redress for various conditions and circumstances of confinement at Rikers Island which fall below the standards of human decency, inflict needless suffering and caused him to be deprived of adequate shelter, reasonable safety and several of life's basic necessities.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as events giving rise to this action occurred within this District.

## PARTIES

5.      Mr. Crichlow has been confined in four separate facilities on Rikers Island from February 2007 to the present. From February 1, 2007 through approximately February 16, 2007, Mr. Crichlow was confined in the Otis Bantum Correctional Center ("OBCC"), located at 16-00 Hazen Street, East Elmhurst, New York 11370. On or about February 16, 2007, Mr. Crichlow was transferred to the Eric M. Taylor Center ("EMTC"), located at 10-10 Hazen Street, East Elmhurst, New York 11370, where he remained confined for almost nine months. During that nine month period, he was briefly transferred to the George R. Vierno Center ("GRVC"), located at 09-09 Hazen Street, East Elmhurst, New York 11370, between July 25, 2007 through August 10, 2007. On or about October 31, 2007, Mr. Crichlow was transferred to the Anna M. Kross Center ("AMKC"), located at 18-18 Hazen Street, East Elmhurst, New York 11370. Mr. Crichlow remains confined at AMKC.

2

6.    Defendant City of New York is a municipal corporation, which through its Department of Correction, operates a number of detention jails. The DOC, through its senior officials at the central office, in each facility, promulgated and implements policies. In addition, senior officials in the DOC are aware of and tolerate certain practices by subordinate employees in the jails, including those that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute unwritten DOC policies or customs. The Department is also responsible for the appointment, training, supervision and conduct of all DOC personnel, including the defendants referenced herein.

7.    Defendant Martin F. Horn is and was at all times relevant to this action, the Commissioner of the DOC. On information and belief, Defendant Horn, as Commissioner of the DOC, is responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and is responsible for the training, supervision, and conduct of all DOC personnel including the defendants referenced herein. Defendant Horn is and was at all relevant times responsible for enforcing the rules of the DOC, and for ensuring that DOC personnel obey the laws of the United States and of the State of New York. He is sued in his official and individual capacities.

8.    Defendant Michael Hourihane was for a portion of the times relevant to this action, the Warden of OBCC. In that capacity Defendant Hourihane was ultimately responsible for the care, custody, and safe treatment of those inmates in OBCC. He is sued in his official and individual capacities.

9.    Defendant Robert Shaw is and was at all times relevant to this action, the Warden of GRVC. In that capacity Defendant Shaw is ultimately responsible for the care, custody, and safe treatment of those inmates in GRVC. He is sued in his official and individual capacities.

10.    Defendant Sandra Langston was for a portion of the time relevant to this action, the Warden of EMTC. In that capacity, Defendant Langston was ultimately responsible for the care, custody, and safe treatment of those inmates in EMTC. She is sued in her official and individual capacities.

11.    Defendant Joandrea Davis is and was for a portion of the time relevant to this action, the Warden of EMTC. In that capacity, Defendant Davis was ultimately responsible for the care, custody, and safe treatment of those inmates in EMTC. She is sued in her official and individual capacities.

12.    At all relevant times herein, Defendants Horn, Hourihane, Shaw, Langston, and Davis, were each a "person" for purposes of 42 U.S.C. §1983, and acted under color of law to deprive Mr. Crichlow of his Constitutional rights, as set forth more fully below.

## FACTUAL ALLEGATIONS

**A.    The Conditions of Mr. Crichlow's Confinement
Violated the Eighth Amendment**

13.    From the time that the first jail opened in New York City, overcrowding has been a recurring problem.

14.    According to the DOC, it now averages a daily inmate count of between 16,500 to 20,000. This number is greater than the entire state prison population of most states.

4

15.    Most of these inmates are housed on Rikers Island, where the facilities are overcrowded.

16.    Upon initial intake at Rikers Island, the DOC determines an inmate's security risk and classification, and his health status before determining an appropriate housing assignment.

17.    When Mr. Crichlow was admitted to the custody of the DOC on Rikers Island on February 1, 2007, he was sick and injured. Mr. Crichlow was known to be HIV positive, his left hand was stitched and bandaged, and his right foot was wounded. Despite his frailty, he was wrongfully assigned to OBCC, a facility for inmates who are classified to be a high security risk, and which predominantly houses gang members.

18.    During the first week of his confinement in OBCC, Mr. Crichlow was placed in the dormitory-style housing unit, commonly know as "1 Upper." There, he was forced to sleep in a bed placed approximately six inches away from the sleeping space of the persons next to him, in clear violation of §1-05 of the City of New York's own minimum standards concerning overcrowding in correctional facilities. Upon information and belief, the City's failure to provide the mandated amount of sleeping space to inmates in OBCC was the result of overcrowding.

19.    In 1 Upper, fifty men slept and bathed without any privacy. Inmates, including Mr. Crichlow, were also routinely deprived of basic hygiene items such as toothpaste, soap, detergent, toilet paper, and blankets because OBCC did not have adequate quantities to supply the number of inmates housed therein. These conditions directly led to increased stress levels, physical discomfort, medical risk and acts of aggression.

5

20.    On or about February 7, 2007, Mr. Crichlow was transferred to the "1 North" section of OBCC, where the conditions were no more humane. In 1 North, Mr. Crichlow was housed in a cell for approximately 12 hours a day. Although the 40-50 prisoners held in 1 North were permitted to spend time outside their cell in a 15 ft by 20 ft common area on the lower level of the cell block, the space was not large enough to accommodate everyone at the same time. During meal times, some inmates were forced to sit on the steps to the common area because there were not enough table and chairs for all of the inmates.

21.    Lock-in periods, in which the inmates were forced to remain in their cells, would often last longer than they should due to delays in shift changes and the searches conducted during lock-in. Specifically, the time that Mr. Crichlow and the other inmates at OBCC were confined to their cell was routinely extended while the officer assigned to that housing unit assisted with searches in other areas of the facility.

22.    In OBCC, opportunities for activities outside Mr. Crichlow's housing unit were also limited. Mr. Crichlow was regularly deprived of the opportunity for exercise, recreation, and law library because they were only offered to his overcrowded housing unit at the same time as other activities such as commissary, meals, sick call, etc. Upon information and belief, these scheduling practices, which violate §§ 1-07 and 1-09 of the City of New York's own minimum standards for correctional facilities, are the function of an over-taxed facility which does not have the space or the resources to accommodate all the inmates it is housing.

23.    On or about February 16, 2007, Mr. Crichlow was transferred to the "2 Upper" section of EMTC, another high security risk facility, which predominantly houses gang

6

members. The living conditions in the 2 Upper cell block were in all material respects the same as 1 North.

24.    While housed in 2 Upper, Mr. Crichlow was, on two separate occasions, the victim of inmate on inmate violence that stemmed from the overcrowded and under-monitored conditions at EMTC.

25.    On or about March 21, 2007, shortly after being transferred to EMTC, Mr. Crichlow was assaulted when he tried to stop an inmate from robbing food from another inmate. Mr. Crichlow sustained an eye and head injury as a result of the assault.

26.    On or about June 20, 2007, Mr. Crichlow was again violently attacked by an inmate who entered his cell and beat his face with a scrub brush. Mr. Crichlow suffered multiple bone fractures to the right side of his face, which ultimately required surgery. Because his facial injuries were so severe, he was placed in voluntary protective custody for the month following the attack.

27.    Mr. Crichlow received inadequate medical care for the facial injuries he suffered as a result of the March 2007 assault. Mr. Crichlow was denied pain medication, denied sick call, and denied the help to care for his wounds and change his dressings.

28.    On those occasions when Mr. Crichlow was permitted to go to sick call, he was forced to do so at the expense of attending law library or going to the yard for recreation. Just as in OBCC, Mr. Crichlow was routinely deprived of the opportunity for exercise, recreation, and law library in EMTC because they were only offered to his overcrowded housing unit at the same time as other activities such as commissary, meals, sick call, etc.

29.    On or about July 25, 2007, Mr. Crichlow was transferred to GRVC where he was confined until approximately August 10, 2007. While there, he only was permitted to shower on four occasions, and his clothing and linens were never laundered. He also was refused permission to go to the law library.

30.    Beginning on or about August 7, 2007, the cell that Mr. Crichlow was housed in did not have operating lights. While in his cell, Mr. Crichlow was in complete darkness until he was transferred back to EMTC on August 10, 2007.

31.    Additionally, due to overcrowding and understaffing at EMTC, there are not enough officers to escort inmates moving between various areas of the correctional facility. During the period of Mr. Crichlow's confinement, on average, there was only one officer-escort available per 400 inmates. As a result of these conditions, Mr. Crichlow was on numerous occasions, deprived of the opportunity to attend activities outside his housing unit in EMTC, or his time at such activities was cut so short as to be rendered useless. On numerous occasions, Mr. Crichlow could not attend religious services because there was not an available corrections officer to escort him. On other occasions, the officer had so many inmates to pick up and drop off before Mr. Crichlow, that Mr. Crichlow would arrive to the law library with only minutes left to conduct research before his overcrowded housing unit's time to use the library expired.

32.    Also as a direct result of overcrowding, certain facilities are completely unavailable to the inmates of EMTC. For example, in the winter months, inmates are not provided with warm, water resistant clothing or footwear to wear in the yard, and there is inadequate, indoor gym space to accommodate the number of inmates housed in EMTC. During

one period of approximately nine months, Mr. Crichlow's housing unit was only permitted to go to the gym twice.

33. On or about July 20, 2007, Mr. Crichlow was transferred to dormitory-style housing in EMTC. As in 1-Upper in OBCC, the dorms of 8 Main and 6 Upper, were overcrowded. In both dorms, Mr. Crichlow was forced to sleep in a bed placed approximately 12 inches away from the sleeping space of the persons next to him, in violation of §1-05 of the City of New York's own minimum standards for overcrowding in correctional facilities. Upon information and belief, the City's failure to provide the mandated amount of sleeping space to inmates in EMTC was the result of overcrowding.

34. Also like in OBCC, EMTC had insufficient health and hygiene supplies for all prisoners housed therein. On numerous occasions, Mr. Crichlow was deprived of these basic necessities. During Mr. Crichlow's confinement, laundry services were also insufficient to provide each inmate with a clean change of clothing at least twice per week in accordance with § 1-04 of the City of New York's own minimum standards concerning personal hygiene. Upon information and belief, the City could not meet these mandates due to overcrowding.

35. Further, due to the overcrowded conditions on Rikers Island, the DOC is unable to provide adequate medical isolation of ill and infectious prisoners. On the contrary, inmates who have been designated as "Medically Isolated," or "MI" are mixed with the general population. For example, on or about March 6, 2007, an inmate named Bruce Hood, who had tested positive for Tuberculosis was placed in Mr. Crichlow's housing unit, posing a direct threat to the health and safety of the inmates there.

9

36.    Because of his fragile health condition, Mr. Crichlow has special dietary needs that were often not met in EMTC. For example, he needs to drink Ensure, a dietary nutritional supplement, daily. However, due to the overcrowded conditions in EMTC, there were inadequate amounts of food for special diets, and Mr. Crichlow was deprived of the proper nutrition that he requires.

37.    The effect of these deprivations was only compounded by the unsanitary living conditions in EMTC. The mess hall and dormitory areas were infested with insects, mice, and other vermin, and food was often served on unclean trays. Overcrowding exacerbated the unsanitary conditions, which in turn made the overcrowding only more dangerous and inhumane.

38.    Mr. Crichlow submitted several grievances concerning the inadequate medical care, unsanitary conditions, and the lack of opportunities for recreation and law library in EMTC, but never received any response. At the recommendation of Officer Holden (Badge # 4920), Mr. Crichlow also submitted a grievance concerning his housing unit's exposure to Bruce Hood, an inmate with Tuberculosis, who should have been placed in Medical Isolation. Mr. Crichlow did not submit any grievances specifically addressing the overcrowded conditions of the dormitory because he believed other inmates had done so and never received a response. Also, because he and they had submitted numerous grievances on various conditions of the prison without receiving a response, he thought further efforts at grieving would be futile.

39.    The totality of the circumstances described above constitute a failure to provide Mr. Crichlow with the basic necessities of life during his confinement. Overcrowding and its effects, including inadequate nutrition, clothing, shelter, sanitation, medical care and personal safety, have caused genuine deprivation and hardship over an extended period of time

for Mr. Crichlow. Such harsh conditions and restrictions are incompatible with contemporary standards of decency, cause wanton and unnecessary infliction of pain, and are not reasonably related to any legitimate penological objectives.

40.    As a result of the foregoing, Mr. Crichlow was subjected to cruel and unusual punishment in violation of the Eighth Amendment.

**B.    The City of New York's Inmate Grievance Procedure<br>Was Not Available To Mr. Crichlow**

41.    Special circumstances excuse Mr. Crichlow's failure to grieve or fully exhaust his administrative remedies.

42.    Upon arrival at Rikers Island, Mr. Crichlow did not receive an inmate handbook or a copy of the grievance procedures.

43.    Grievance forms are not readily available to the inmates on Rikers Island. Complete grievance forms were not available in OBCC. Correct forms were unavailable in EMTC until an inmate transferred from another facility gave a copy to the law library.

44.    When Mr. Crichlow was nevertheless able to submit grievances while housed in OBCC and EMTC, none of them were ever answered.

45.    When Mr. Crichlow tried to speak with the grievance officer of EMTC, Mr. Mulvaney, he was refused permission to do so, as inmates may not to go to the grievance office unless they are summoned.

46.    When Mr. Crichlow wrote to the DOC central office at 60 Hudson Street, he was merely referred back to the grievance office. In the response letter, Corrections Officer

11

Sumpter of the central office, did not inform Mr. Crichlow that he could appeal his grievance to the next level if it was undecided in a particular time frame.

47.     Upon information and belief, it is an official, unwritten policy of the DOC to ignore most of the grievances it receives from the inmate population, so as to frustrate and impede the claims of unsophisticated parties such as Mr. Crichlow.

48.     Upon information and belief, Defendants routinely deprive inmates of access to the grievance procedure, to stymie complaints regarding conditions of confinement and thereafter avail themselves of a non-exhaustion defense which further frustrates, if not stifles, inmates like Mr. Crichlow from pursuing valid legal claims concerning the overcrowded conditions in OBCC and EMTC.

49.     This policy and practice rendered the grievance procedure unavailable to Mr. Crichlow.

## COUNT I

### Violation of the Eighth and Fourteenth Amendments and 42 U.S.C. §1983 Against Defendants Horn, Hourihane, Shaw, Langston and Davis

50.     Mr. Crichlow repeats and realleges the foregoing paragraphs as if they were fully set forth herein.

51.     Defendants' policies, practices, acts, and omissions with respect to overcrowding at OBCC and EMTC deprived Plaintiff of adequate shelter, reasonable safety, and basic human needs, and placed Mr. Crichlow at unreasonable risk of increased violence, illness, mental suffering, and deteriorating health.

12

52.    Defendants knew of and disregarded conditions posing an excessive risk to Plaintiff's health and safety, but failed to take necessary or appropriate action to rectify those conditions. Defendants were deliberately indifferent to the serious hardship inflicted on Mr. Crichlow by the unconstitutional conditions of his confinement, and to the concomitant infringement of his rights.

53.    By reason of the foregoing, and by subjecting Mr. Crichlow to overcrowding and its effects, Defendants deprived Plaintiff of rights, remedies, privileges, and immunities secured by 42 U.S.C. §1983, including, but not limited to, rights guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution.

54.    Defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employments as DOC officers and employees. Defendants' acts, or failure to act, were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. Defendants acted willfully, knowingly, and with the specific intent to deprive Mr. Crichlow of his constitutional rights secured by 42 U.S.C. §1983, and the Eighth and Fourteenth Amendment to the United States Constitution.

55.    As a direct and proximate result of the facts alleged, Mr. Crichlow sustained physical, psychological and emotional injury.

## COUNT II

### Violation of the Eighth and Fourteenth Amendments and 42 U.S.C. §1983 Against Defendant City of New York

56.    Mr. Crichlow repeats and realleges the foregoing paragraphs as if they were fully set forth herein.

13

57.     Defendant's policies, practices, acts, and omissions with respect to overcrowding at OBCC and EMTC deprived Plaintiff of adequate shelter, reasonable safety, and basic human needs, and placed Mr. Crichlow at unreasonable risk of increased violence, illness, mental suffering, and deteriorating health.

58.     Defendant knew of and disregarded conditions posing an excessive risk to Plaintiff's health and safety, but failed to take necessary or appropriate action to rectify those conditions.

59.     Defendant City of New York, through the DOC, and acting under pretense and color of law, did permit, tolerate, and act with deliberate indifference to a pattern and practice of overcrowded conditions at Rikers Island.  This widespread tolerance of overcrowding and its effects constitutes a municipal policy, practice, or custom, and led to Mr. Crichlow's injuries.

60.     By permitting, tolerating, and sanctioning a persistent and widespread policy, practice and custom, which subjected Mr. Crichlow to overcrowded conditions and its effects, Defendant City of New York has deprived him of rights, remedies, privileges, and immunities secured by  42 U.S.C. §1983, and the Eighth and Fourteenth Amendments to the United States Constitution.

61.     As a direct and proximate result of the facts alleged, Mr. Crichlow sustained physical, psychological and emotional injury.

## **JURY DEMAND**

62.     Mr. Crichlow demands a trial by jury in this action.

14

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Crichlow respectfully prays for judgments against the Defendants as follows:

  (a) Awarding compensatory damages for violations of 42 U.S.C. §§ 1983;

  (b) Awarding reasonable attorneys' fees and costs of this action, pursuant to 42 U.S.C. §1988; and

  (c) Awarding such other relief as this Court may deem just and proper.

Dated:  New York, New York
        December 26, 2007

                          STROOCK & STROOCK & LAVAN LLP

                          By: _____

                              James L. Bernard (JB-4273)
                              Kevin J. Curnin (KC-3561)
                              Ilana Cutler (IC-3378)
                              Michelle H. Schott (MS-1039)
                              180 Maiden Lane
                              New York, New York 10038-4982

                              *Attorneys for Plaintiff*

15

# APPENDIX II

*The City of New York*

*Board of Correction*

MINIMUM STANDARDS FOR
NEW YORK CITY CORRECTIONAL FACILITIES

CITY OF NEW YORK
MICHAEL R. BLOOMBERG, Mayor

(f) Bedding
(1) By September 1, 1978, upon admission to an institution, all prisoners shall be provided at Department expense with an issue of bedding, including but not limited to:
(i) two sheets;
(ii) one pillow;
(iii) one pillow case;
(iv) one mattress;
(v) one mattress cover; and
(vi) sufficient blankets to provide comfort and warmth
(2) Prior to being issued, all bedding items shall be checked for damage and repaired or cleaned, if necessary
(3) Pillowcases and sheets shall be cleaned at least once each week Blankets shall be cleaned at least once every six months
(4) Mattresses must be constructed of fire retardant materials Mattress covers must be constructed of materials both water resistant and easily sanitized
(5) All items of clothing and bedding stored within the institution shall be maintained in a safe and sanitary manner

(j) Housing Areas
(1) Prisoners shall be provided at Department expense with a supply of brooms, mops, soap powder, disinfectant, and other materials sufficient to property clean and maintain housing areas
(2) The Department shall develop a plan for the regular cleaning of all housing areas, including cells, tiers, dayrooms, and windows, and for the extermination of rodents and vermin in all housing areas. Such plans shall be submitted to the Board within 90 days of the effective date of this standard
(3) All housing areas shall contain at least the following facilities in sufficient supply to meet reasonable standards of prisoner personal hygiene:
(i) sink with hot and cold water;
(ii) flush toilet; and
(iii) shower with hot and cold water

## SECTION 1-05 OVERCROWDING

(a) Policy
Prisoners shall not be housed in cells, rooms or dormitories unless adequate space and furnishings are provided

8

(b) Single Occupancy
(1) A cell or room designed or rated for single occupancy shall house only one prisoner
(2) Each single cell shall contain a flush toilet, a washbasin with drinking water and, at a minimum, the following furniture:
(i) a single bed; and
(ii) by September 1, 1978, a locker or drawer that can be closed
(3) A single-cell housing area shall contain table or desk space for each occupant that is available for use at least 12 hours per day

(c) Multiple Occupancy
(1) A multiple occupancy area shall contain a single bed for each occupant, a locker or drawer that can be closed for each occupant, and by September 1, 1978, table or desk space for each occupant that is available for use at least 12 ho...
(2) Multiple occupancy areas shall provide a minimum of ... feet of floor space per person in the sleeping area
(3) A multiple occupancy area shall provide a minimum of one operable toilet and shower for every 8 prisoners and ... operable sink for every 10 prisoners Toilets shall be accessible for use without staff assistance 24 hours per day
(4) A multi-occupancy area shall provide a dayroom space that is physically and acoustically separate from but immediately adjacent and accessible to the sleeping area
(5) A multi-occupancy area shall house no more than:
(i) 50 Detainees
(ii) 60 Sentenced Prisoners Section 1-05 (c) (5-ii) shall be applicable to all multi-occupancy areas opened after July 1, 1985

## SECTION 1-06 LOCK-IN

(a) Policy
The time spent by prisoners confined to their cells should be kept to a minimum and required only when necessary for the safety and security of the institution

(b) Involuntary Lock-In
No prisoner shall be required to remain confined to his or her cell except for the following purposes:
(1) At night for count or sleep, not to exceed eight hours in any 24-hour period;

9

(2) During the day for count or required institutional business that can only be carried out while prisoners are locked in, not to exceed two hours in any 24-hour period. This time may be extended if necessary to complete an off count

(3) Within 60 days of the effective date of this standard, the Department shall submit to the Board its list of institutions, if any, that require more than two hours of lock-in during the day, because of unique problems Pursuant to Section 1-16, the Board shall determine if any variance from the requirement of Section 1-06 (b) (2) is necessary

(c) Optional lock-in.
(1) Prisoners shall have the option of being locked in their cells during lock-out periods Prisoners choosing to lock in at the beginning of a lock-out period of two hours or more, shall be locked out upon request after one-half of the period At this time, prisoners who have been locked out shall be locked in upon request

(2) The Department may deny optional lock-in to a prisoner in mental observation status if a psychiatrist or psychologist determines in writing that optional lock-in poses a serious threat to the safety of that prisoner. A decision to deny optional lock-in must be reviewed every ten days, including a written statement of findings, by a psychiatrist or psychologist Decisions made by a psychiatrist or psychologist pursuant to this Section must be based on personal consultation with the prisoner

(d) Schedule
Each institution shall maintain and distribute to all prisoners or post in each housing area its lock-out schedule, including the time during each lock-out period when prisoners may exercise the options provided by Section 1-06(c)

SECTION 1-07 RECREATION

(a) Policy
Prisoners shall be provided with adequate indoor and outdoor recreational opportunities

(b) Recreation Areas
By September 1, 1978, indoor and outdoor recreation areas of sufficient size to meet the requirements of this part shall be established and

10

maintained by each institution. An outdoor recreation area must allow for direct access to sunlight and air

(c) Recreation Schedule
Recreation periods shall be at least one hour, only time spent at the recreation area shall count toward the hour Recreation shall be available five days per week in the outdoor recreation area, except in inclement weather when the indoor recreation area shall be utilized By September 1, 1978, such recreation shall be available daily

(d) Recreational Equipment
The Department shall make available to prisoners an adequate amount of equipment during the recreation period. A list of the equipment available at each institution shall be submitted to the Board within 30 days of the effective date of this standard

(e) Recreation Within Housing Area
(1) Prisoners shall be permitted to engage in recreation activities within cell corridors and tiers, dayrooms and individual housing units. Such recreation may include but is not limited to:
(i) table games;
(ii) exercise programs; and
(iii) arts and crafts activities
(2) Recreation taking place within cell corridors and tiers, dayrooms and individual housing units shall supplement, but not fulfill, the requirements of Section 1-07 (c)

(f) Recreation for Prisoners in Segregation
Prisoners confined in administrative or punitive segregation shall be permitted recreation in accordance with Section 1-07 (c)

SECTION 1-08 RELIGION

(a) Policy
Prisoners have an unrestricted right to hold any religious belief, and to be a member of any religious group or organization, as well as to refrain from the exercise of any religious beliefs. A prisoner may change his or her religious affiliation

(b) Exercise of Religious Beliefs
(1) Prisoners are entitled to exercise their religious beliefs in any manner that does not constitute a clear and present danger to the safety or security of an institution
(2) No employee or agent of the Department or of any voluntary program shall be permitted to proselytize or seek to convert any

11

prisoner, nor shall any prisoner be compelled to exercise or be dissuaded from exercising any religious belief

(3) Equal status and protection shall be afforded all prisoners in the exercise of their religious beliefs except when such exercise is unduly disruptive of institutional routine

(c) **Congregate Religious Activities**
(1) Consistent with the requirements of Section 1-08(a), all prisoners shall be permitted to congregate for the purpose of religious worship and other religious activities
(2) Each institution shall provide all prisoners access to an appropriate area for congregate religious worship and other religious activities Consistent with the requirements of Section 1-08(b)(1), this area shall be made available to prisoners in accordance with the practice of their religion

(d) **Religious Advisors**
(1) As used in this part, the term "religious advisor" shall mean a person who has received ecclesiastical endorsement from the relevant religious authority
(2) Religious advisors shall be permitted to conduct congregate religious activities permitted pursuant to Section 1-08(c) When no religious advisor is available, a member of a prisoner religious group may be permitted to conduct congregate religious activities
(3) Consistent with the requirements of Section 1-08(b)(1), prisoners shall be permitted confidential consultation with their religious advisors during lock-out periods

(e) **Celebration of Religious Holidays or Festivals**
Consistent with the requirements of Section 1-08(b)(1), prisoners shall be permitted to celebrate religious holidays or festivals on an individual or congregate basis

(f) **Religious Dietary Laws**
Prisoners are entitled to the reasonable observance of dietary laws or fasts established by their religion. Each institution shall provide prisoners with food items sufficient to meet such religious dietary laws

(g) **Religious Articles**
Consistent with the requirements of Section 1-08(b)(1), prisoners shall be entitled to wear and to possess religious medals or other religious articles, including clothing and hats

12

(h) **Exercise of Religious Beliefs by Prisoners in Segregation**
(1) Prisoners confined in administrative or punitive segregation shall not be prohibited from exercising their religious beliefs, including the opportunities provided by Sections 1-08 (d), 1-08 (e), 1-08 (f), and 1-08 (g)
(2) Congregate religious activities by prisoners in administrative or punitive segregation shall be provided for by permitting such prisoners to attend congregate religious activities with appropriate security either by themselves or with other prisoners

(i) **Recognition of a Religious Group or Organization**
(1) A list shall be maintained of all religious groups and organizations recognized by the Department This list shall be in Spanish and English and shall be distributed to all incoming prisoners or posted in each housing area
(2) Each institution shall maintain a list of the religious advisor, if any, for each religious group and organization, and the time and place for the congregate service of each religion. This list shall be in Spanish and English and shall be distributed to all incoming prisoners or posted in each housing area
(3) Prisoner requests to exercise the beliefs of a religious group or organization not previously recognized shall be made to the Department
(4) In determining requests made pursuant to paragraph (3) of this subdivision, the following factors among others shall be considered as indicating a religious foundation for the belief:
(i) whether there is substantial literature supporting the belief as related to religious principle;
(ii) whether there is formal, organized worship by a recognizable and cohesive group sharing the belief;
(iii) whether there is an informal association of persons who share common ethical, moral, or intellectual views supporting the belief; or
(iv) whether the belief is deeply and sincerely held by the prisoner
(5) In determining requests made pursuant to paragraph (3) of this subdivision, the following factors shall not be considered as indicating a lack of religious foundation for the belief:
(i) the belief is held by a small number of individuals;
(ii) the belief is of recent origin;
(iii) the belief is not based on the concept of a Supreme Being or its equivalent; or
(iv) the belief is unpopular or controversial

13

(6) In determining requests made pursuant to paragraph (3) of this subdivision, prisoners shall be permitted to present evidence indicating a religious foundation for the belief

(7) The procedure outlined in Sections 1-08(i) (1) and 1-08 (i) (3) shall apply when a prisoner request made pursuant to Section 1-08 (i) (3) is denied

(j) Limitations on the Exercise of Religious Beliefs

(1) Any determination to limit the exercise of the religious beliefs of any prisoner shall be made in writing and shall state the specific facts and reasons underlying such determination. A copy of this determination, including the appeal procedure, shall be sent to the Board and to any person affected by the determination within 24 hours of the determination

(2) This determination must be based on specific acts committed by the prisoner during the exercise of his or her religion that demonstrate a serious and immediate threat to the safety and security of the institution. Prior to any determination, the prisoner must be provided with written notification of the specific charges and the names and statements of the charging parties, and be afforded an opportunity to respond

(3) Any person affected by a determination made pursuant to this subdivision may appeal such determination to the Board

(i) The person affected by the determination shall give notice in writing to the Board and the Department of his or her intent to appeal the determination

(ii) The Department and any person affected by the determination may submit to the Board for its consideration any relevant material in addition to the written determination

(iii) The Board or its designate shall issue a written decision upon the appeal within 14 business days after it has received notice of the requested review

## SECTION 1-09 ACCESS TO COURTS

(a) Policy

Prisoners are entitled to access to courts, attorneys, legal assistants and legal materials

(b) Judicial and Administrative Proceedings

(1) Prisoners shall not be restricted in their communications with courts or administrative agencies pertaining to either criminal or civil proceedings

14

(2) Timely transportation shall be provided to prisoners scheduled to appear before courts or administrative agencies. Vehicles used to transport prisoners must meet all applicable safety and inspection requirements and provide adequate ventilation, lighting and comfort

(c) Access to Counsel

(1) Prisoners shall not be restricted in their communication with attorneys. The fact that a prisoner is represented by one attorney shall not be grounds for preventing him or her from communicating with other attorneys. Any properly identified attorney may visit any prisoner with the prisoner's consent

(i) An attorney may be required to present identification to a designated official at the central office of the Department in order to obtain an institutional pass. This pass shall remain in effect for a minimum of three years and shall permit the attorney to visit any prisoner under the custody of the Department.

(ii) The Department may only require such identification that is normally possessed by an attorney

(2) The Department may limit visits to any attorney of record attorney with a court notice for prisoners undergoing competency pursuant to court order

(3) Visits between prisoners and attorneys shall be kept and protected, in accordance with provisions of Section 1-10 Legal visits shall be permitted at least eight hours per day between 8 am and 8 pm. During business days, four of those hours shall be 8 am to 10 am, and 6 pm to 8 pm. The Department shall maintain and post the schedule of legal visiting hours at each institution

(4) Mail between prisoners and attorneys shall not be delayed, read, or interfered with in any manner, except as provided in Section 1-12

(5) Telephone communications between prisoners and attorneys shall be kept confidential and protected, in accordance with the provisions of Section 1-11

(d) Access to Co-defendants

Upon reasonable request, regular visits shall be permitted between a detainee and all of his or her co-defendants who consent to such visits. If any of the co-defendants are incarcerated, the Department may require that an attorney of record be present.

15

**(e) Attorney Assistants**

(1) Law students, legal paraprofessionals, and other attorney assistants working under the supervision of an attorney representing a prisoner shall be permitted to communicate with prisoners by mail, telephone and personal visits, to the same extent and under the same conditions so far for the purpose of representing the prisoner Law students, legal paraprofessionals and other attorney assistants working under the supervision of an attorney contacted by prisoner shall be permitted to communicate with that attorney by mail, telephone, or personal visits to the same extent and under the same conditions that the attorney may do

(2) An attorney assistant may be required to present a letter of identification from the attorney to a designated official at the central office of the Department in order to obtain an institutional pass. A pass shall not be denied based upon any of the items listed in Section 1-10 (h) (1)

(3) The pass shall remain in effect for a minimum of one year and shall permit the assistant to perform the functions listed in Section 1-09 (e) It may be revoked if specific acts committed by the legal assistant demonstrate his or her threat to the safety and security of an institution This determination must be made pursuant to the procedural requirements of Section 1-10 (h) (2), 1-10 (h) (4) and 1-10 (h) (5)

**(f) Law Libraries**

Each institution shall maintain a properly equipped and staffed law library

(1) The law library shall be located in a separate area sufficiently free of noise and activity and with sufficient space and lighting to permit sustained research

(2) Each law library shall be open for a minimum of five days per week including at least one weekend day In facilities with more than 600 prisoners, each law library shall be open for a minimum facilities with 600 or fewer prisoners, each law library shall be open for a minimum of eight and a half hours during lock-out hours, on days of operation In all facilities, the law library shall be open on all days of operation for at least three hours between 6 pm and 10 pm The law library will be kept open for prisoners use on all holidays which fall on regular law library days except:
New Year's Day
July 4th
Thanksgiving
Christmas

16

The law library may be closed on holidays other than those specified provided that law library services are provided on either of the two days of the same week the law library is usually closed On holidays on which the law library is kept open, it shall operate for a minimum of eight hours No changes to law library schedules in effect on January 1, 1986, shall be made without written notice to the Board of Correction, which must be received at least five business days before the planned change(s) is to be implemented

(3) The law library schedule shall be arranged to provide access to prisoners during times of the day when other activities such as recreation, commissary, meals, school, sick call, etc are not scheduled Where such considerations cannot be made, prisoners shall be afforded another opportunity to attend the law library at a later time during the day

(4) Each prisoner shall be granted access to the law library for a period of at least two hours per day each day the law library is open. Upon request, extra time may be provided as needed, space and time permitting. In providing extra time, prisoners on trial and those with an impending court deadline, shall be granted preference

(5) The law library hours for prisoners in punitive segregation may be reduced or eliminated, provided that an alternative method of access to legal materials is instituted to permit effective legal research

(6) Legal research classes for general population prisoners shall be conducted at each facility on at least a quarterly basis Legal research training materials shall be made available upon request to prisoners in special housing

(7) The Department shall periodically report to the Board detailing the resources available at the law library at each institution, including a list of titles and dates of all law books and periodicals and the number, qualifications and hours of English and Spanish-speaking legal assistants

**(g) Legal Documents and Supplies**

(1) Each law library shall contain necessary research and reference materials, which shall be kept properly updated and supplemented, and shall be replaced without undue delay when materials are missing or damaged

(2) Prisoners shall have reasonable access to typewriters and photocopiers for the purpose of preparing legal documents A sufficient number of operable typewriters and a photocopy machine will be provided for prisoner use

17

(3) Legal clerical supplies, including pens, legal paper and pads and carbon paper shall be made available for purchase by prisoners. Such legal clerical supplies shall be provided to indigent prisoners at Department expense.

(4) Unmarked legal forms which are commonly used by prisoners shall be made available. Each prisoner shall be permitted to use or make copies of such forms for his or her own use.

(h) **Law Library Staffing**
(1) During all hours of operation, each law library shall be staffed with trained civilian legal coordinator(s) to assist prisoners with the preparation of legal materials. Legal coordinator coverage shall be provided during extended absences of the regularly assigned legal coordinator(s)

(2) Each law library shall be staffed with an adequate number of permanently assigned correction officers knowledgeable to law library procedures

(3) Spanish speaking prisoners shall be provided assistance in use of the law library by employees fluent in the Spanish language on an as needed basis

(i) **Number of Legal Documents and Research Materials**
(1) Prisoners shall be permitted to purchase and receive an unrestricted number of law books and other legal research materials from any source

(2) Reasonable regulations governing the keeping of materials in cell and the searching of cells may be adopted, but under no circumstances may prisoners legal documents, books, and papers be read or confiscated by correctional personnel without a lawful warrant. Where the space in a cell is limited, an alternative method of safely storing legal materials elsewhere in the institution is required, provided that a prisoner shall have regular access to these materials.

(j) **Limitation of Access to Law Library**
(1) A prisoner may be removed from the law library if he or she disrupts the orderly functioning of the law library or does not use the law library for its intended purposes. A prisoner may be excluded from the law library for more than the remainder of one law library period only for a disciplinary infraction occurring within a law library

(2) Any determination to limit a prisoner's right of access to the law library shall be made in writing and shall state the specific facts and reasons underlying such determination. A copy of this

determination, including the appeal procedure, shall be sent to the Board and to any person affected by the determination within 24 hours of the determination

(3) An alternative method of access to legal materials shall be instituted to permit effective legal research for any prisoner excluded from the law library. A legal coordinator shall visit any excluded prisoner to determine his or her law library needs upon request

(4) Any person affected by a determination made pursuant to this subdivision (j) may appeal such determination to the Board
(i) The person affected by a determination shall give notice in writing to the Board and to the Department of his or her intent to appeal the determination.
(ii) The Department and any person affected by the determination may submit to the Board for its consideration any relevant material in addition to the written determination
(iii) The Board or its designee shall issue a written decision upon the appeal within five business days after it has received notice of the requested review.

## SECTION 1-10 VISITING

(a) **Policy**
Prisoners are entitled to receive personal visits of sufficient length and number

(b) **Visiting and Waiting Areas**
(1) By September 1, 1978, a visiting area of sufficient size to meet the requirements of this Part shall be established and maintained in each institution

(2) The visiting area shall be designed so as to allow physical contact between prisoners and their visitors as required by Section 1-10 (f)

(3) The Department shall make every effort to minimize the waiting time prior to a visit Visitors shall not be required to wait outside an institution unless adequate shelter is provided and the requirements of Section 1-10 (b) (4) are met

(4) All waiting and visiting areas shall provide for at least minimal comforts for visitors, including but not limited to:
(i) sufficient seats for all visitors;
(ii) access to bathroom facilities and drinking water throughout the waiting and visiting periods;

## DECLARATION OF SERVICE

**DEBORAH A. DORFMAN**, under penalty of perjury, declares pursuant to 28 U.S.C. §1746 that, on January 18, 2008, I caused a true and correct copy of the Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, attached thereto, to be served by First Class Mail and E-mail on Michelle H. Schott, Esq., attorney for plaintiff, at Stroock & Stroock, & Lavan, LLP, 180 Maiden Lane, New York, New York, 10038-4982, the address designated by him for that purpose.

Dated:     New York, New York
           January 18, 2008

By:     _____
        Deborah A. Dorfman
        Assistant Corporation Counsel